**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **LEONTYNE GREEN,** | : | |
| **Plaintiff,** | : | |
| **v.** | : | **CIVIL NO. 08-5872** |
| | : | |
| **MCNEIL CONSUMER HEALTH CARE, et al.,** | : | |
| **Defendants.** | : | |
| | : | |

**MEMORANDUM OPINION AND ORDER**

**RUFE, J.**                                                    **September 9, 2010**

On December 18, 2008, Plaintiff Leontyne Green ("Plaintiff" or "Green") filed the instant action, alleging race discrimination, sex discrimination, and retaliation by her former employer, Defendants McNeil Consumer Health Care and McNeil-PPC, Inc. ("Defendants" or "McNeil").[1] Now before the Court is Defendants' Motion for Summary Judgment,[2] asking the Court to dismiss Plaintiff's case in its entirety. This Motion has been fully briefed, oral argument has been held thereon, and it is ripe for disposition.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiff, an African-American female,[3] began working full-time for McNeil in July 1999.[4] In August 2003, Plaintiff was promoted from associate product director to marketing

---

[1] The Complaint named a third defendant, Johnson & Johnson, against which Plaintiff has since withdrawn all claims. See Doc. No. 30.

[2] Doc. No. 22.

[3] Compl. ¶ 11.

[4] Green Dep. 14 (Defs.' Mot. for Summ. J. Ex. 1 (Doc. No. 22)).

manager for the Tylenol Professional marketing group ("Tylenol group").[5] Eric Bruno, employed

by McNeil as the franchise director for Tylenol, became Plaintiff's supervisor in October 2004.[6] On

February 15, 2005, Plaintiff met with Bruno to request a promotion to a consumer brand

management position.[7] Bruno denied the request,[8] explaining that "I think you have a great

combination of book smarts and street smarts, and I would just be concerned about . . . moving you

on."[9] Plaintiff asked Bruno to provide an example of a time when she demonstrated "street smarts"

at work, and Bruno had no answer.[10] Plaintiff reported the "street smarts" comment to Ellen

McMahon, a representative in McNeil's Human Resources department, and explained that she felt

that she was being treated differently by Bruno due to her race and sex.[11] She further notified Human

Resources that she felt Bruno's behavior towards her was "consistent to how he had previously

treated other Black women in his reporting structure."[12] McMahon then contacted Bruno to notify

him that Plaintiff had been disturbed by his "street smarts" comment and that Plaintiff might contact

him to discuss the matter further.[13]

In April 2005, employees in the Tylenol group, including Plaintiff, went on a

---

[5]Id. at 41.

[6]Id. at 51-52. He remained her first or second line supervisor until her termination in June 2006. See
Bruno's EEOC statement ¶ 3 (Pl.'s Resp. Ex. D (Doc. No. 23)).

[7]Green Dep. 173-76.

[8]Id. at 176.

[9]Id. at 175-76.

[10]Id. at 176.

[11]Id. at 215, 219.

[12]Id. at 215.

[13]McMahon Dep. 177-78 (Defs.' Mot. for Summ. J. Ex. 4).

company retreat to Hershey Park.[14]  On the second evening, the group had dinner together and then

went to a bowling alley.[15]  While at the bowling alley, Plaintiff sat and socialized with two of her

female colleagues, Trisha Smith and Jen Cullen, who are Caucasian.[16]  The day after the retreat,

Plaintiff received a voicemail message from Bruno, stating that she "wasn't very engaged at dinner

and at the bowling alley," and that "it's really important for the social networking of the group to

make sure that [Plaintiff is] being very social with [her] colleagues. . . ."[17]  Smith and Cullen did not

receive similar messages.[18]  Plaintiff then left a voicemail for Bruno, stating that she did not feel it

was appropriate to criticize her behavior considering that "it was apparent that [she] wasn't feeling

well" at the event and he had not left similar messages for other employees.[19]  Bruno replied in a

second voicemail that he did not mean to criticize Plaintiff, but that "it would be really great for [her]

to make sure that [she is] engaging with other members of the team."[20]

Plaintiff received a promotion to marketing manager for a consumer brand, "Upper

Respiratory," in July 2005.[21]  She did not receive a pay increase along with the promotion.[22]  Hearing

that other employees had been offered a pay increase to join the "Upper Respiratory" group and

_____

[14]Green Dep. 160-63.

[15]Id.

[16]Id.

[17]Id. at 163.

[18]Id. at 164.

[19]Id. at 165-66.

[20]Id. at 166.

[21]Id. at 71.

[22]Id. at 88-90.

believing that she was entitled to the same, Plaintiff approached Steve Smith, her supervisor and the director for the "Upper Respiratory" group.[23] Smith communicated her request to Bruno without success. However, Bruno contemporaneously granted a salary increase for Rebecca Sears, a Caucasian female and an associate marketing manager, who was also moving to the "Upper Respiratory" group.[24] Bruno claimed that Plaintiff's move to the new group did not require a salary increase because her current salary level was comparable to other marketing managers.[25]

In the Fall of 2005, the Management Leadership Team ("MLT") at McNeil, composed of all the managers within the Tylenol group, met to conduct their annual evaluation of the group members.[26] Despite the designation of a "5" rating by two of Plaintiff's direct supervisors, Smith and Ken El'Sherif, Plaintiff received an overall "4" rating for 2005, her lowest score to date.[27] Smith and Heather Helle, another one of Plaintiff's supervisors, each observed that Bruno's evaluation had influenced the "4" rating.[28] Of the six objective categories in her 2005 evaluation form, Plaintiff received "MET" for three and "EXCEEDS" for three.[29] Bruno also gave Plaintiff a "4" rating for her 2006 performance.[30] McNeil terminated Plaintiff on June 9, 2006 as part of a Reduction in Force ("RIF"); Bruno was the employee responsible for choosing which four of its twenty existing full-time

---

[23]Id. at 85-89.

[24]Id. at 89-90.

[25]Id. at 88-89.

[26]Compl. ¶ 21; Transcript of oral argument at 11 ("Tr.") (Doc. No. 32).

[27]Pl.'s Resp. at 2; El'Sherif Dep. 30 (Pl.'s Resp. Ex. N.); Smith Dep. 134 (Pl.'s Resp. Ex. O).

[28]Green Dep. 125-26, 130-31.

[29]Pl.'s Resp. Ex. C.

[30]Bruno EEOC Statement ¶ 11.

marketing managers would be terminated.[31]

On or about July 28, 2006, Plaintiff filed charges of discrimination and retaliation against Defendants with the United States Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC"). On October 2, 2008, the EEOC issued Plaintiff a right-to-sue letter. Plaintiff thereafter brought the instant action alleging sex-based and race-based discrimination and retaliation under Title VII of the Civil Rights Act of 1964,[32] "Section 1981,"[33] and the Pennsylvania Human Relations Act ("PHRA").[34] Defendants' Motion for Summary Judgment argues that (1) Plaintiff has submitted no substantive proof of disparate treatment based on her race or gender to sustain a cause of action for discrimination, and (2) Plaintiff has failed to demonstrate that Defendants engaged in any retaliatory conduct after she filed a complaint with the McNeil Human Resources department.

## II. STANDARD FOR SUMMARY JUDGMENT

Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56. A moving party may be granted summary judgment with respect to any claim if the evidence shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[35] A court may consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" in making its

---

[31]Pl.'s Resp. at 2; McMahon statement at 3 (Defs.' Mot. for Summ. J. Ex. 5).

[32]42 U.S.C. § 2000e *et seq.*

[33]42 U.S.C. § 1981 (1977).

[34]43 Pa. C.S.A. § 951 *et seq.*

[35]FED. R. CIV. P. 56(c) (2010 Revised).

determination.[36] An issue is "genuine" if a reasonable trier of fact could find for the nonmoving party in light of the evidence,[37] and a court must consider the evidence in a light most favorable to the nonmoving party.[38]

The burden is initially on the moving party to show an absence of evidence to support a claim raised by the nonmoving party.[39] Upon a showing by the moving party that the claims of the nonmoving party cannot be supported by the available evidence, the burden shifts to the nonmoving party to rebut the motion with the elements essential to maintain its case,[40] through the use of its "own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."[41] There must be enough evidence for a reasonable juror to decide for the nonmoving party; a mere scintilla of evidence is not enough.[42] If the nonmoving party fails to meet its burden, summary judgment is appropriate.

### III. DISCUSSION

As an initial matter, the Court notes that Pennsylvania courts interpret the PHRA in the same manner as Title VII.[43] Similarly, § 1981 claims require the same elements of proof as Title

---

[36] Id.

[37] See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

[38] See Pollock v. American Tel. & Tel. Long Lines, 794 F.2d 860, 864 (3d Cir. 1986).

[39] Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004).

[40] Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006).

[41] Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (internal quotations omitted).

[42] Anderson, 477 U.S. at 252.

[43] Theriault v. Dollar Gen., 336 Fed. Appx. 172, 174 n.1 (3d Cir. Pa. 2009) (citing Gomez v. Allegheny Health Servs., Inc., 71 F.3d 1079, 1083-84 (3d Cir. 1995)).

VII claims.[44]  Because claims under the PHRA and § 1981 are analyzed in the same manner as Title VII, the Court will outline the requirements as set forth under Title VII only; however, the analysis applies equally to each of Plaintiff's PHRA and § 1981 claims.

*A. Discrimination (Counts I and II)*

Under Title VII of the Civil Rights Act of 1964 it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."[45]

In the instant action, Green alleges that Defendants (through employee Eric Bruno) treated non-members of her protected classes (i.e., non-African-American or male employees) more favorably in areas of promotion, retention, compensation, and performance review.  In a disparate treatment case, a "violation is made out when an individual of a protected group is shown to have been singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion under Title VII."[46]  In this type of action, discriminatory intent is established through the presentation of direct evidence, or through indirect or circumstantial evidence.[47]

Under <u>McDonnell Douglas Corp. v. Green</u>[48] and its progeny, a three-step process guides the Court in its analysis.  This three-step process first requires the plaintiff to establish a

---

[44]<u>Tucker v. Merck & Co.</u>, 131 Fed. Appx. 852, 854-55 (3d Cir. 2005) (internal citations omitted).

[45]42 U.S.C. § 2000e-2(a)(1).

[46]<u>See</u> <u>Matthews v. Dep't. of Hous. & Urban Dev.</u>, 1990 U.S. Dist. LEXIS 4283, at *10 (E.D. Pa. Apr. 12, 1990) (citing <u>Int'l Bhd. of Teamsters v. United States</u>, 431 U.S. 324, 335-36 n. 15 (1977)).

[47]<u>Id.</u>

[48]411 U.S. 792 (1973); <u>see</u> <u>also</u> <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 506 (1993).

prima facie case of discrimination.[49]  If the plaintiff satisfies this burden then the second step is

reached and the burden of production shifts to the employer who must articulate a legitimate,

nondiscriminatory explanation for the employer's adverse employment decision.[50]  If the employer

does not satisfy this burden, then judgment is entered for the plaintiff.  If, however, the defendant

does advance a legitimate nondiscriminatory reason, then step three is reached.  In step three, the

plaintiff must submit evidence showing that the employer's stated reasons are not the true reasons,

i.e., the reasons are a pretext for discrimination.[51]

Defendants herein assert that Plaintiff has not offered substantive proof of disparate

treatment based on her race or sex.  The Court concludes that Plaintiff has submitted sufficient proof

as to her race discrimination claim.  Although Defendants claim that "no reasonable person" could

have considered Bruno's "street smarts" comment to be discriminatory, it was made in a context in

which Plaintiff was denied a promotion, and thus potentially could be seen as derogatory or even

discriminatory by a trier of fact.  Furthermore, Plaintiff's request for a salary increase approximately

five months later, allegedly communicated to Bruno through Smith, was denied, despite a

simultaneous salary increase granted for a Caucasian female manager also moving to the "Upper

Respiratory" group.  Plaintiff's evidence regarding McNeil's salary increase policies is significant,

as she has presented the Court with different examples of similar managerial transfers by Caucasian

employees that were accompanied by raises.

There are also genuine issues of material fact regarding the MLT performance

---

[49]McDonnell Douglas, 411 U.S. at 801-02.

[50]Id. at 802.

[51]Texas Dept. of Cmty. Affairs v. Burdine, 101 S.Ct. 1089, 1091 (1981).

evaluation process, particularly regarding Bruno's participation in the calibration process. Plaintiff

produced evidence that the ratings submitted by El'Sherif and Smith, her direct supervisors, were

higher than the rating given by Bruno. Plaintiff further alleges that her fall 2005 "4" performance

rating was her lowest to date, and lower than her Caucasian colleagues despite marks reflecting that

she met or exceeded performance expectations. Overall, Plaintiff claims that prior to the events

alleged in her Complaint, she had received at least one promotion and one salary increase during her

tenure at McNeil, and had achieved consistently high performance evaluations. This

uncharacteristically lower rating eventually contributed to Plaintiff's termination. Although the other

three managers laid-off in Plaintiff's group in the 2006 RIF were Caucasian, Plaintiff was the sole

African-American employee out of twenty total managers in the group. Although Defendants argue

that there were other legitimate reasons for Plaintiff's low "4" rating and her eventual termination,

the record evidence shows that Bruno's influence on these matters was significant. As such, and

interpreting the facts in a light most favorable to the nonmoving party, Plaintiff's race discrimination

claim shall survive summary judgment.

The Court agrees with Defendants, however, as to Plaintiff's claim of sex

discrimination. Both the February 15th conversation with Bruno and Bruno's phone call regarding

the Tylenol group retreat allegedly targeted Plaintiff based on her race, not her sex. The term "street

smarts," interpreted generously in a negative light as Plaintiff requests, refers to a trait presumably

possessed by African-Americans.[52] At the retreat, Plaintiff asserts that her two Caucasian *female*

colleagues were not similarly reprimanded by Bruno for their lack of socialization. The only

---

[52]Although Plaintiff refers to an alleged statement made by African-American female colleague Fatima
Saliu that "Bruno had issues with Black women," this statement is hearsay and is not considered by the Court for
purposes of summary judgment. See Smith v. City of Allentown, 589 F.3d 684, 693-94 (3d Cir. 2009).

evidence that might support a case of sex discrimination is the performance evaluations of Caucasian

males that Plaintiff selects for comparison. These alone, however, are not enough to establish a

prima facie case of sex discrimination on the part of Defendants.

The Court concludes that Plaintiff has offered sufficient proof of disparate treatment

based on her race, but not her gender, to proceed to trial. Thus, Count II shall be dismissed, and

Count I remains.

*B. Retaliation (Count III)*

McNeil also moves for summary judgment on Plaintiff's retaliation claim, arguing

that Plaintiff has failed to establish a prima facie case. Section 704(a), 42 U.S.C. § 2000e-3(a) of

Title VII states:

> It shall be an unlawful employment practice for an employer
> to discriminate against any of his employees or applicants for
> employment . . . because he has opposed any practice made by
> this title, or because he has made a charge, testified, assisted,
> or participated in any manner in an investigation, proceeding,
> or hearing under this title.

Hence, an employer is prohibited from taking retaliatory action against an employee when that

employee complains of a practice that would violate Title VII.[53] In order to make a prima facie

retaliation claim, plaintiff must show that: "(1) the employee engaged in a protected employee

activity; (2) the employer took an adverse employment action after or contemporaneous with the

employee's protected activity; and (3) a causal link exists between the employee's protected activity

---

[53] As with a determination of race discrimination under Title VII, the analysis with regard to a retaliation
claim is the same under Section 1981 and the PHRA. See Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001)
(explaining the requirements that a plaintiff must satisfy in order to sufficiently allege a claim for retaliation under §
1981); Bailey v. Storlazzi, 729 A.2d 1206, 1214 (Pa. Super. Ct. 1999) (explaining the necessary requirements for a
retaliation claim under the PHRA, 43 P.S. § 955(d)).

and the employer's adverse action."[54]

Plaintiff filed a formal complaint of discrimination against Bruno after their conversation on February 15th, claiming that he mistreated her due to her sex and race in denying her a promotion and by commenting that she had "street smarts." Opposition to allegedly discriminatory employment practices such as this qualifies as protected activity.[55] McMahon testified that she notified Bruno of Plaintiff's complaint against him. A few months later, when Plaintiff received a promotion and was transferred to the "Upper Respiratory" group, Plaintiff alleges that Bruno denied her request for a salary increase. In addition, Plaintiff submitted testimony from other McNeil managers that Bruno significantly influenced the "4" rating awarded by the MLT when it convened in October or November of 2005. Bruno also awarded Plaintiff a "4" rating for her 2006 performance, and then made the decision to select her for termination during McNeil's RIF.

The time between these alleged retaliatory actions was relatively brief; each occurred within a few months of each other.[56] Moreover, Plaintiff asserts that there was an intervening antagonistic act that contributed to the causal link between the complaint and the adverse actions, namely, the singling-out of her behavior at the Tylenol group retreat in April 2005 by Bruno. Although Defendants dispute the level of Bruno's involvement in the MLT rating decision, and assert that there are alternative legitimate reasons for the decision to terminate Plaintiff, Plaintiff has submitted sufficient evidence to raise genuine issues of material fact regarding the causal link

---

[54] Abramson v. William Paterson College of N.J., 260 F.3d 265, 286 (3d Cir. 2001).

[55] A person engages in opposition under Title VII or the PHRA when she opposes any employment practice made unlawful by those statutes. 42 U.S.C. § 2000e-3(a); 43 Pa. C.S.A. § 955(d) (1997); see also Robinson v. Southeastern Pa. Transp. Auth., 982 F.2d 892, 896 n.4 (3d Cir. 1993).

[56] "To establish a causal connection, plaintiff must show either temporal proximity between the protected activity and the adverse employment action or evidence of ongoing antagonism." Abramson, 260 F.3d at 288.

between her formal complaint of discrimination and the adverse employment actions. A jury could

find that the temporal proximity of Plaintiff's complaint of discrimination to the denial of a salary

increase, negative ratings, and termination, is close enough to establish causation. Thus, the Court

will deny Defendants' Motion as it pertains to Plaintiff's retaliation claim.

## IV. CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is granted

in part, denied in part. An appropriate Order follows.